UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

NATHANIEL MAURICE SMITH,

        Plaintiff,

   v.                                                        Case No. 19-cv-0262-bhl

MARK JENSEN, et al.,

        Defendants.

---

## DECISION AND ORDER

Plaintiff Nathaniel Smith, who is serving a state prison sentence at the Dodge Correctional Institution and representing himself, filed this action pursuant to 42 U.S.C. §1983, alleging that his civil rights were violated while he was incarcerated at the Waupun Correctional Institution. Smith is proceeding on Eighth Amendment claims based on allegations that Defendants were deliberately indifferent to his foot pain. On February 2, 2021, Defendants filed a motion for summary judgment. Dkt. No. 38. For the reasons explained below, the Court will grant the motion and dismiss this case.

### BACKGROUND

Smith was housed at Waupun from March 30, 2018 until December 31, 2019. Dkt. No. 40 at ¶1. Defendant Dr. Jeffrey Manlove worked at Waupun as a physician; he was Smith's primary care provider. *Id.* at ¶¶2, 24. Defendant Chrystal Marchant was the Nursing Supervisor/Health Services Manager and Defendants Mark Jensen and Gwendolyn Vick were nurses.

On April 5, 2018, shortly after being housed at Waupun, Smith complained of left foot pain from an old gunshot injury. Dkt. No. 40 at ¶27. On April 9, 2018, a nurse (who is not a defendant)

assessed his pain and his request for a lower bunk restriction. *Id.* at ¶28. She noted that he could wiggle his toes and move his ankle and concluded that he did not meet the criteria for a low bunk. *Id.* Smith reported that he could work and play sports, and he noted that his ibuprofen had been taken away. *Id.* at ¶29. The nurse gave him some ibuprofen, discussed his complaints with an advanced care provider, and ordered that Smith be scheduled for an in-person visit with an advanced care provider. *Id.* at ¶¶29-30. Dr. Manlove ordered Naproxen that same day. *Id.* at ¶29.

The next day, on April 30, 2018, Dr. Manlove saw Smith for complaints of pain in his left ankle, reportedly caused by a bullet that had been left in his ankle for nearly twenty years. Dkt. No. 40 at ¶31. Manlove noted no apparent distress and "a mobile subcutaneous mass on [Smith's] dorsolateral midfoot," which Manlove assumed was the bullet. *Id.* Dr. Manlove ordered a left foot x-ray, an appointment with Physio (an orthotic specialist for special shoes), and a follow-up with himself after Smith saw Physio. *Id.* at ¶32.

Smith's foot was x-rayed on May 7, 2018. Dkt. No. 40 at ¶33. The x-ray showed the bullet was present on the lateral aspect of the foot, at the level of the tarsal bones, within soft tissue. *Id.* Smith saw Physio on September 25, 2018, for an evaluation for orthotic shoes. *Id.* at ¶34. Smith reported that pressure and motion on the spot caused tingling and shooting pain. *Id.* Physio noted that Smith had a flatfoot condition, collapsing arch, and a large prominence on the lateral midfoot. *Id.* at ¶35. He ordered ortho shoes, which were issued to Smith on December 18, 2018. *Id.* at ¶36.

A few months after his Physio visit, on December 26, 2018 while seeing Dr. Manlove for complaints of shoulder pain, Smith also complained about left foot pain from the bullet. Dkt. No. 40 at ¶38. Dr. Manlove noted that he could "see where this could be quite uncomfortable with weightbearing and shoes and given the superficial nature of this it might be easily dealt with." *Id.* at ¶39. Dr. Manlove decided to refer Smith for an orthopedic consult. *Id.* He believed that either

2

podiatry or orthopedics could address the issue, and since Smith already needed to see orthopedics for his shoulder, Dr. Manlove thought both issues could be taken care of during a single specialist visit.  *Id.* at ¶40.

Smith saw Dr. Nelson (who is not a defendant) on June 18, 2019 for an orthopedic consult. Dkt. No. 40 at ¶42.  Dr. Nelson informed Smith that his left foot pain could not be evaluated in the orthopedic practice because they treat only acute fractures involving the foot.  *Id.*  He advised that chronic foot pain should be assessed by podiatry.  *Id.*  Dr. Nelson noted that the fact that the injury was twenty years old raised significant doubt about the veracity of Smith's pain and motion limitation complaints.  *Id.* at ¶43.

About six weeks later, on August 2, 2019, Dr. Manlove met with Smith to talk about the orthopedic consult.  Dkt. No. 40 at ¶44.  Smith informed Dr. Manlove that Dr. Nelson declined to address his chronic foot pain and recommended a podiatry referral.  *Id.*  Smith points out that Dr. Manlove should have learned this information from Dr. Nelson's report, which presumably was available shortly after Smith's consult.  Dkt. No. 49 at ¶44.  Dr. Manlove ordered a podiatry referral that same day, but it is not clear when the referral was scheduled.  Dkt. No. 40 at ¶46.  Dr. Manlove suggests that there may have been an administrative error transferring the order or making the appointment. [1]  *Id.*  Finally, in response to Smith's assertion that Naproxen was not working, Dr. Manlove changed the order from Naproxen to Salsalate, which he supplemented with acetaminophen.  *Id.* at ¶45.

On September 3, 2019, Dr. Manlove saw Smith again for complaints of foot and shoulder pain.  Dkt. No. 40 at ¶47.  Smith now complained of a numbing sensation in his foot.  *Id.*  Dr.

---

[1] Dr. Manlove asserts that Smith had a scheduled appointment with podiatry as of September 3, 2019.  Dkt. No. 40 at ¶¶48, 56.  However, Smith asserts that the referral to podiatry was not scheduled until November 25, 2019.  Dkt. No. 49 at ¶¶48, 56.  Smith has not presented evidence that Dr. Manlove had responsibility beyond ordering that someone schedule the referral.

3

Manlove asserts that he was not sure whether the newly reported numbness was related to the bullet. *Id.* at ¶¶48, 51. Dr. Manlove also prescribed amitriptyline, which can be effective for neuropathic pain (numbness and tingling). *Id.* at ¶¶49-50. He also ordered an electromyogram and nerve conduction study (EMG), which is a diagnostic test to identify and localize a nerve injury or source of neurogenic pain. *Id.* at ¶¶52-53.

Dr. Manlove saw Smith a couple weeks later, on September 24, 2019 for complaints of foot pain. Dkt. No. 40 at ¶55. Smith told Dr. Manlove that he did not think amitriptyline or Salsalate were effective. *Id.* As of that date, Dr. Manlove says Smith was scheduled to see podiatry, and he had an EMG scheduled for January 27, 2020. *Id.* at ¶56. Dr. Manlove told Smith there was not much more he could do until after the EMG and podiatry consult. *Id.* at ¶57. The next day, Dr. Manlove switched Smith to ibuprofen 800 mg twice a day. *Id.* at ¶58.

Smith was released from Waupun on December 30, 2019. Dkt. No. 40 at ¶61. At that time, he had an EMG scheduled for January 27, 2020 and a podiatry appointment scheduled for February 13, 2020. *Id.* at ¶61.

While Smith was at Waupun, he submitted thirty-seven health service requests and nine information requests about his left ankle/foot pain, low bunk restriction, and pain medication. Dkt. No. 40 at ¶65. All of his requests were triaged and responded to by nursing staff. *Id.* Marchant responded to one of the thirty-seven requests, Jenson responded to nine, and Vick responded to fourteen. *Id.* at ¶¶66, 68-70. They generally kept him updated about his upcoming appointments off-site and with Dr. Manlove, advised him to give his new shoes a chance, or referred his questions to the appropriate party. *Id.* at ¶68. At no time did Marchant, Jenson, or Vick personally assess Smith for his foot pain. *Id.* at ¶67. Five of Smith's health service requests/information requests were addressed directly to Dr. Manlove. Dkt. no. 40 at ¶62. Based on the records, it appears that

nurses triaging the request forms forwarded only one health services request to Dr. Manlove, which he responded to. *Id.* at ¶¶63-65.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

Smith asserts that Defendants were deliberately indifferent to his foot pain. The Eighth Amendment prohibits medical staff from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical

condition, and then determining whether the individual was deliberately indifferent to that condition." *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017) (quoting *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016)).

Defendants assert that Smith has not produced evidence from which a reasonable jury could conclude that he suffered from an objectively serious medical condition. The Seventh Circuit has "found the following circumstances to be indications that a prisoner has a serious medical need: The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (citations and internal question marks omitted). Smith presents evidence that he persistently complained about chronic and substantial pain, numbness, and tingling in his foot while he was at Waupun. Defendants challenge whether Smith's complaints of pain were truthful, highlighting that the gunshot injury was nearly twenty years old, one doctor raised significant doubts about the veracity of the pain, and Smith abandoned his efforts to obtain treatment after he was released. But whether Smith was telling the truth about his pain is not at issue on summary judgment. Were a jury to believe Smith's assertions of the pain he says he experienced, it could reasonably conclude that he satisfies the objective prong of the standard.

Accordingly, the only question before the Court is whether Smith presents sufficient evidence from which a reasonable jury could conclude that Defendants were deliberately indifferent to his foot pain. Smith asserts that Dr. Manlove demonstrated deliberate indifference both in how he decided to treat Smith's pain and by delaying treating the pain. The Court will address each argument in turn.

The Seventh Circuit has observed that "[w]ithin the universe of deliberate indifference cases is a narrower category when a prisoner alleges not that his condition was ignored entirely, but that he received constitutionally deficient treatment for the condition." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019). The Seventh Circuit has clarified that these cases are better framed "not [as] deliberate indifference to a serious medical need," but as a challenge to "a deliberate decision by a doctor to treat a medical need in a particular manner." *Id.* (quoting *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996)). In those cases, courts are to defer to a medical professional's treatment decision "unless 'no minimally competent professional would have so responded under those circumstances.'" *Id.* (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). Further, in evaluating treatment decisions, a Court must "look at the totality of [the] medical care when considering whether the care evidences deliberate indifference to serious medical needs." *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018) (citations omitted).

The record is full of evidence of Dr. Manlove's attempts to diagnose the source of Smith's pain and to relieve the pain. Dr. Manlove ordered diagnostic tests (an x-ray and EMG), ordered referrals to specialists (Physio, orthopedics, and podiatry), and adjusted Smith's pain medication in response to his complaints that the medication was not working (from Naproxen to Salsalate and acetaminophen to amitriptyline to ibuprofen). While it is true that his efforts were apparently not successful in diagnosing or addressing Smith's pain, the Seventh Circuit has clarified that "[t]he test of deliberate indifference ensures that the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). "Indeed, prison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately

7

indifferent." *Id.* Based on the totality of the care Dr. Manlove provided, no reasonable jury could conclude that his efforts to address Smith's foot pain demonstrate deliberate indifference.

Smith also argues that, even if Dr. Manlove's treatment decisions were constitutionally adequate, he still demonstrated deliberate indifference by delaying making those decisions, resulting in Smith's pain being unnecessarily prolonged. Under §1983, a defendant will be liable for damages only if he was personally responsible for the deprivation of a constitutional right. *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019). Thus, to survive summary judgment on his claim that Dr. Manlove delayed treating his foot pain, Smith had to present evidence showing that Dr. Manlove was responsible for the delay.

Every time Dr. Manlove examined Smith, he ordered changes to his medication or ordered referrals to offsite specialists. Admittedly, months passed before these offsite appointments occurred, but Dr. Manlove explains that he had no responsibility for scheduling and has no control over an offsite specialist's availability. Dkt. No. 40 at ¶41. Dr. Manlove is not liable for a delay he did not create and could not remedy. *See Alexander v. Richter*, 756 F. App'x 611 614-15 (7th Cir. 2018) (holding that plaintiff could not establish defendants were deliberately indifferent with regard to deficiencies in optical department services because they lacked authority to increase optometrists' hours at the prison).

Dr. Manlove did make two decisions that arguably resulted in a delay for which he bore responsibility. He did not immediately refer Smith to podiatry because he opted to first refer him to orthopedics. Dr. Manlove believed orthopedics could address Smith's shoulder and foot pain at the same time. He also failed to immediately review the orthopedist's report and therefore did not learn that a referral to podiatry was needed until six weeks after the orthopedic consult when he met with Smith for a follow-up visit. However, Dr. Manlove's mistaken belief that orthopedics

8

could address Smith's foot pain and his decision to delay reviewing the orthopedist's report until he met with Smith in person are, at worse, mere negligence and do not give rise to constitutional violations. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (holding that "even admitted medical malpractice does not give rise to a constitutional violation"). Thus, neither Dr. Manlove's treatment decisions nor his delay in making those decisions violate the Constitution. He is entitled to summary judgment.

Finally, Marchant, Jensen, and Vick are also entitled to summary judgment. None of these Defendants were personally involved in or responsible for Smith's care. Jensen and Vick merely responded to Smith's health service requests by keeping him informed of upcoming appointments and directing his requests to the responsible parties. They responded to every health service request they were tasked with triaging, so no reasonable jury could conclude that they ignored Smith's complaints. Further, given that Dr. Manlove's decisions posed no obvious risks to Smith's health, they were entitled to defer to his treatment plan. *See Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1076 (7th Cir. 2012).

As to Marchant, Smith argues that, as the health services unit manager, she was "responsible for overseeing the operation of [the health services unit], and also manag[ing] the medical care plans for the inmate[s] under her care." Dkt. No. 48 at 4. However, it has long been settled that the doctrine of respondeat superior cannot be used to hold a supervisor liable for the misconduct of a subordinate. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Further, the Court has found that Smith received constitutionally adequate care for his complaints of foot pain, so her deference to Dr. Manlove's treatment decisions did not violate the Constitution.

9

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Dkt. No. 38) is **GRANTED** and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 13th day of April, 2021.

BY THE COURT:

s/ *Brett H. Ludwig*
Brett H. Ludwig
United States District Judge

---

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

10

Case 2:19-cv-00262-BHL   Filed 04/13/21   Page 10 of 10   Document 52